## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| JAMES JACKSON, | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| VS. | § | Civil Action No.  2:17-cv-259 |
| | § | |
| | § | |
| THE LINCOLN NATIONAL LIFE | § | |
| INSURANCE COMPANY, | § | |
| | § | |
| Defendant. | § | |

## ORIGINAL COMPLAINT

1. James Jackson ("Plaintiff") files this Complaint against The Lincoln National Life Insurance Company ("Lincoln").

## I.
## Parties

2. Plaintiff is an individual and resident of Nueces County, Texas.

3. Lincoln is an insurance company licensed to do business in Texas, with its principal place of business in North Carolina. Lincoln can be served with citation by serving its Attorney for Service, Corporation Service Company, by certified mail, return receipt requested, at 211 East 7th Street, Austin, Texas 78701-3218.

## II.
## Jurisdiction and Venue of ERISA Claims

4. This action against Lincoln arises under the Employee Retirement Income Security Act of 1974 ("ERISA" or the "Act"), 29 U.S.C. §1001 *et. seq.*

5. This Court has jurisdiction over the action pursuant to 29 U.S.C. § 1132(e)(1).

6. Venue is proper in this district pursuant to 29 U.S.C. § 1132(e)(2) because the breach occurred in this district.

7. Pursuant to 29 U.S.C. § 1132(h), this Complaint has been served upon the Secretary of Labor, Employee Benefits Security Administration, 200 Constitution Avenue, N.W., Washington, D.C. 20210 and the Secretary of the Treasury, 1500 Pennsylvania Avenue, Washington, D.C. 20220, by certified mail return receipt requested.

### III.
### Factual Background

8. Plaintiff was employed by STVT-AAI Education, Inc. ("STVT") as an Instructor of nursing—a light duty physical demand position.[1] While employed by STVT, Plaintiff was a participant in an employee benefit plan that provided group short-term ("STD") and long-term disability ("LTD") benefits ("The Plan") to STVT employees.

9. Plan benefits are paid to STVT employees through insurance contracts issued by Lincoln (the "Policy" or "Policies").

10. The Policies provided STD and LTD benefits to all full-time employees in active employment.

11. At all pertinent times, Plaintiff was an employee of STVT and was a participant, within the meaning of 29 U.S.C. § 1002(7), in the Plan.

12. The Lincoln STD Policy provides that an employee may receive STD benefits up to a maximum of 26 weeks from the date of his disability if they meet the following definition of "Total Disability:" "the Insured Person's inability, due to Sickness or Injury, to perform each of the Main Duties of his or her Own Occupation."

13. "Own Occupation" was defined as follows:

---

[1] Light work involves the ability to lift up to 20 pounds and requires frequent walking and/or standing.

2

>   Own Occupation or Regular Occupation means the occupation, trade or profession:
>
>   > (1) in which the Insured Person was employed with the Employer prior to Disability; and
>   > (2) which was his or her main source of earned income prior to Disability.
>
>   It means a collective description of related jobs, as defined by the U.S. Department of Labor Dictionary of Occupational Titles. …

14. "Main Duties" was defined as "those job tasks that: (1) are normally required to perform the Insured Person's Own Occupation; and (2) could not reasonably be modified or omitted. …"

15. The Lincoln LTD Policy provided an almost identical definition of total disability for the first 24 months of disability.

16. Under the Policies, Lincoln would consider a participant's eligibility for LTD after the 26 weeks of STD payments ended.

17. Plaintiff ceased working at STVT on July 8, 2015 after injuring his neck, lower back, and left shoulder in a serious car accident.

18. As part of his application for STD benefits, Plaintiff submitted an Attending Physician Statement from Dr. Francisco Acebo, his family practitioner, who diagnosed him with cervicalgia and lumbar radiculopathy with the resulting symptoms of chest pain, bilateral leg pain, and left arm numbness and pain as a result of his accident. In the APS, Dr. Acebo expressed his opinion Plaintiff was not only disabled from his own occupation as an instructor, but also from any other occupation as a result of his accident, he did not expect a fundamental change in Plaintiff's condition for at least the next six months, and his opinions were based on the abnormal results from a lumbar MRI.

19. On July 23, 2015, Lincoln notified Plaintiff it had determined he was disabled and approved his claim for STD benefits effective July 9, 2015 in the amount of $300 a week.

20. After approving his benefits, Lincoln continually requested updated medical information to determine if he continued to be eligible for benefits.

21. As part of this continual review, Plaintiff submitted another APS from Dr. Acebo on August 13, 2015, in which the physician noted that in addition to the abnormal lumbar MRI results he previously received, Plaintiff also had a cervical MRI that showed he had spondylosis with right neural foraminal narrowing at C5-C6. He also opined Plaintiff could not engage in sitting or standing for longer than 30 minutes, he had a "[s]evere limitation of functional capacity, incapable of minimum (sedentary) activity," and he was "unable to engage in stress situations or engage in interpersonal relations (marked limitation)."

22. Based on the new APS, on August 21, 2015, Lincoln extended Plaintiff's benefits through September 21, 2015.

23. Soon thereafter, Lincoln requested updated medical records for Plaintiff and reviewed records from Dr. Andrew Indresano, an orthopedic surgeon who treated Plaintiff for his neck injury, Dr. Miguel Berastain, an orthopedic surgeon who treated Plaintiff for his left shoulder injury, and Dr. Wilson Velasquez, his pain management doctor.

24. Dr. Indresano's office visit notes showed he had diagnosed Plaintiff with cervical radiculopathy and neuritis, neck sprain, cervical disc displacement, and left shoulder impingement syndrome. Upon physical examination, he noted Plaintiff had left greater than right cervical paraspinal tenderness to palpation, decreased sensation globally in the left upper extremity, and positive Neer's and Hawkins in his left shoulder. Dr. Indresano also reviewed results from Plaintiff's July 31, 2015 MRI of his cervical spine and noted it showed he had disc

4

degeneration at the C5-C6 disc space. He referred Plaintiff to Dr. Berastain for the injury to his left shoulder and ordered Plaintiff to have epidural steroid injections.

25. Dr. Berastain's office visit notes showed upon examination, Plaintiff had limited active and passive range of motion and positive drop arm, Neer's and Hawkins in his left shoulder. Dr. Berastain concluded Plaintiff had shoulder impingement with great discomfort in the glenohumeral joint. He ordered a MRI of the left shoulder and discussed the possibility of surgery with Plaintiff.

26. Dr. Velasquez's office visit notes showed Plaintiff complained of stabbing, sharp pain in his neck and lower back that worsened upon standing, sitting, or engaging in mild activities and was only relieved upon lying down. He noted Plaintiff had been prescribed Tramadol and physical therapy in the past, but that it had not helped his pain. Upon examination, Dr. Velasquez noted Plaintiff had multiple areas of tenderness in the para spinal muscle in the thoraco-lumbar area, moderate to severe inflammation and tenderness with palpation in the facet joints at L4-L5 and L5-S1, increased pain with flexion and extension of the back, loss of lumbar lordosis, significantly impaired range of motion in the lumbar spine, and tenderness over the hip intertrochanteric bursa. As a result, he diagnosed Plaintiff with arthropathy of the lumbar facet joint and scheduled Plaintiff for a facet block injection of steroids.

27. On September 28, 2015, Andrea Mendick, a nurse employed by Lincoln, reviewed Plaintiff's claim and determined Plaintiff's benefits should be continued until she received the results of the MRI of Plaintiff's left shoulder and his next office visit with Dr. Berastain. Mendick concluded based on her review of Plaintiff medical records he had a "functional impairment that would preclude him from lifting up to 20 pounds." Although she

5

acknowledged Dr. Indresano had precluded Plaintiff from sitting or standing longer than 30 minutes, she believed Plaintiff would be able to work if STVT did not require him to perform much lifting, which ignored the definition of "Own Occupation" in the policy that cited to the Dictionary of Occupational Titles, not Plaintiff's particular job for his particular employer and the requirement that he be able to stand and/or walk for most of the day.

28. On October 2, 2015, Lincoln's claim examiner, Kaleigh Winseman, contacted Plaintiff to inquire about the status of his shoulder MRI. Plaintiff informed her he had not scheduled it yet due to insurance issues. Winseman told him Lincoln needed the MRI results in order to continue his benefits and that because he was not receiving any treatment for his injuries—a fact that was contradicted by the medical records Plaintiff just submitted—she was suspending payment of his claim and sending his claim for another review by Mendick immediately to determine if his benefits should be terminated entirely. In making this decision, Winseman also ignored Plaintiff's objective medical findings and restrictions and limitations that rendered him disabled.

29. On or about October 9, 2015, Plaintiff submitted additional medical records from his chiropractor, Dr. Michael Mauger. Dr. Mauger's office visit notes showed Plaintiff complained of severe headaches, neck pain and stiffness, pain in both shoulders, middle and lower back pain, and pain to the sacroiliac joint. Upon examination, Dr. Mauger noted Plaintiff had limited range of motion in his neck, in his shoulders bilaterally, but worse on the left, thoracic spine and lumber spine, muscle spasms in his lumbar spine and neck, a positive Jackson's compression test result in his neck, and positive supine and sitting straight leg raises and Yeoman's test results in the lumbar spine. He emphasized Plaintiff could not work and had great difficulty performing activities of daily living.

6

30. Mendick also discovered on or about that date that Plaintiff's next office visit with Dr. Berastain, the orthopedic surgeon treating his shoulder, was on November 2, 2015.

31. Based on this information and the prior medical records Plaintiff submitted, Mendick concluded "the medical findings support a functional impairment that would preclude the clmt from occasionally lifting up to 20 pounds; frequently lifting up to 10 pounds; frequently standing/walking and occasionally sitting" until at least November 2, 2015, when Plaintiff had his next appointment with Dr. Berastain. Accordingly, on October 13, 2015, Winseman sent Plaintiff a letter to notify him his benefits had been extended to November 2, 2015 and asked that he submit updated medical records.

32. On October 30, 2015, Plaintiff submitted the results of a mental status evaluation performed by Dr. Kate Rodriguez, a psychologist, on October 28, 2015. The evaluation showed that as a result of his car accident, Dr. Rodriguez had diagnosed Plaintiff with Post Traumatic Stress Disorder ("PTSD") and generalized anxiety disorder ("GAD") because he experienced the following symptoms: (1) flashbacks and nightmares of the car accident; (2) avoidance of driving, working, attending medical appointments (such as the facet block injections), and socializing with others, causing him to infrequently leave his home; (3) persistent feelings of fear, anger, guilt and shame; and (4) frequent episodes of anxiety and worry, irritability, lack of concentration, severe fatigue, and difficulty sleeping. Dr. Rodriguez concluded based on his diagnoses and symptoms, Plaintiff had significant mental impairments that prevented him from performing his activities of daily living, engaging in social interactions with others, and working as an instructor for STVT.

33. On November 6, 2015, one of Lincoln's examiners conducted a claimant interview with Plaintiff who emphasized he had both physical and mental disabilities preventing

7

him from returning to work as an instructor. He advised the examiner he was undergoing two hours of psychotherapy a week for his PTSD and GAD, he could not stand for prolonged periods due to pain, and he spent most of his time lying down to prevent worsening pain. He also advised the examiner he had not had steroid injections for his pain and was uncomfortable taking psychotropic medication due to anxiety and a pill phobia he developed after his accident.

34. On November 10, 2015, Plaintiff submitted additional medical records from Dr. Velasquez, his pain management doctor. Those records showed upon examination, Plaintiff still had had multiple areas of tenderness in the para spinal muscle in the thoraco-lumbar area, moderate to severe inflammation and tenderness with palpation in the facet joints at L4-L5 and L5-S1, increased pain with flexion and extension of the back, loss of lumbar lordosis, significantly impaired range of motion in the lumbar spine, and tenderness over the hip intertrochanteric bursa.

35. Once Lincoln received Plaintiff's records from Dr. Velasquez, it sent his claim for another clinical review by Mendick, whose initial impression was Plaintiff no longer had any functional impairments preventing him from returning to work in his own occupation, despite her conclusion less than a month earlier that he did have functional impairments that rendered him disabled. Winseman told Plaintiff about the clinical review and advised him his STD payments would be suspended again until Mendick completed the review.

36. On November 20, 2015, Plaintiff submitted a letter to Lincoln authored by Dr. Acebo stating he was "disabled from all occupations at this time. Return to work date is still unknown." He also submitted additional medical records from Dr. Acebo that showed he still suffered from severe anxiety which caused him to have difficulty concentrating and being around

8

other people, he still had a pill phobia, but was able to take half his dosage of Xanax, his left shoulder pain was still excruciating, and he was getting physical therapy.

37. On November 23, 2015, Mendick finished her clinical review of the claim which included her review of all the Plaintiff's medical records Lincoln had to date in connection with Plaintiff's disability. She concluded "a functional impairment is not found beyond 11/02/15." She reached this conclusion based on the fact she had never received a MRI of Plaintiff's shoulder, he was not receiving injections (even though that was due to his mental disability), he was not taking medication for his PTSD and GAD (which was untrue based on Dr. Acebo's records), and because he could schedule his psychotherapy, physical therapy and injection appointments around his work schedule. Mendick's conclusion almost entirely ignored the substance of Plaintiff's medical records, his mental disability, and all the objective medical evidence supporting his physical disability.

38. Based on Mendick's conclusions, Lincoln terminated Plaintiff's benefits effective November 2, 2015. Winseman sent Plaintiff a letter on November 23, 2015 advising of Lincoln's decision and setting forth the reasons for the denial. As with Mendick's clinical review, Winseman almost entirely ignored the objective medical evidence supporting both his physical and mental disabilities. She repeated Mendick's conclusions he had "no functional impairment" beyond November 2, 2015 and that if he needed to seek treatment for his physical or mental conditions, he could schedule that around his work hours.

39. Plaintiff appealed the termination of his benefits on February 19, 2016. With his appeal, he submitted a February 11, 2016 Psychological Evaluation for Impairment Rating Exam perform by psychologist Dr. Susan Rudolph and additional medical records from Dr. Acebo, Dr. Indresano, and Dr. Berastain.

40. In her report, Dr. Rudolph concluded based on her evaluation, Plaintiff met the criteria for PTSD and panic disorder with agoraphobia because he experienced the following symptoms: (1) intrusive distressing memories of his car accident, dissociative reactions, intense psychological and physiological distress at exposure to cues that symbolize the accident, and persistent avoidance of stimuli associated with the accident; (2) a persistent state of fear, diminished interest in social events or associating with others, and inability to feel positive emotions such as happiness or satisfaction; (3) marked alterations in emotions and activity associated with the accident such as irritable and angry outbursts towards others, hypervigilance, problems concentrating, and difficulty going to and staying asleep; (4) recurrent unexpected panic attacks that bring intense fear and discomfort; (5) physiological symptoms such as heart palpitations, sweating, shaking, shortness of breath, nausea and abdominal distress, and feeling dizzy; and (6) psychological symptoms such as a fear of losing control, a fear of dying along with persistent worry and avoidance of people and stressful situations. She stressed these diagnoses and severe symptoms prevented Plaintiff from working.

41. The updated medical records from Dr. Berastain and Dr. Indresano revealed they continued to find objective medical evidence of Plaintiff's physical impairments upon examination—for example, widespread limited range of motion and continued tenderness upon palpation in his neck, shoulders and lumbar spine. Dr. Berastain determined based on a MRI of Plaintiff's shoulder his shoulder pain was neurogenic and connected to his injuries to his cervical spine. Dr. Indresano determined Plaintiff had diagnoses of cervical radiculopathy and cervicalgia. Both doctors also stressed Plaintiff had not had the epidural steroid injections they recommended due to phobias caused by his PTSD.

42. The updated medical records from Dr. Acebo showed he reviewed Dr. Rudolph's

report and agreed with her conclusions about Mr. Jackson's mental impairments and he had prescribed Xanax for his panic attacks and anxiety.

43. Plaintiff's appeal was assigned to Melissa Patterson, a Lincoln appeals consultant. On February 25, 2016, only five days after Plaintiff submitted his appeal, Patterson had already determined she was going to uphold the decision to terminate Plaintiff's STD benefits. Before sending the claim for another nurse clinical review, she concluded on her own that the "medical documentation contained in [the] claim file does not support Total Disability as defined by this policy."

44. On March 1, 2016, after already deciding she would uphold Lincoln's initial decision, Patterson referred Plaintiff's claim for another nurse clinical review. Virginia Rush conducted the clinical review.

45. Rush determined, based merely on her review of Plaintiff's medical records, while she did not doubt Plaintiff had neck and back pain and would need to have his employer accommodate frequent positional changes between standing and sitting for him to be able to return to work, she did not believe there were any other functional impairments that prevented him from performing his own occupation. As with Lincoln's initial decision to terminate Plaintiff's benefits, Rush concluded Plaintiff could schedule any injections, physical therapy, or psychotherapy around his work hours and she almost entirely ignored his mental disability.

46. On March 31, 2016, Patterson informed Plaintiff she upheld Lincoln's decision to terminate his benefits. Patterson's stated reasons for the decision were the same conclusions Rush reached in her clinical review.

47. On September 27, 2016, Plaintiff submitted a second appeal to Lincoln of the termination of his STD benefits. With his appeal, he submitted a letter drafted by Dr. Acebo, a

letter drafted by Dr. Rudolph, and additional medical records from Dr. Acebo, Dr. Mauger, and the emergency room at Christus Spohn Hospital.

48. In Dr. Acebo's September 23, 2016 letter, he opined Plaintiff's physical impairments prevented him from engaging in prolonged sitting, walking or standing. He based this opinion on his history of treating and examining Plaintiff, as well as his review of Plaintiff's records from Dr. Berastain and Dr. Indresano. He also stressed Plaintiff suffered from mental impairments due to PTSD, panic disorder, and a new diagnosis of major depressive disorder and he prescribed him several different medications in the past to treat his symptoms arising from these disorders. Dr. Acebo concluded, based on his observations of Plaintiff's mental and physical impairments, he was totally disabled and his condition was not expected to improve without continued extensive treatment.

49. In Dr. Rudolph's September 19, 2016 letter, she stated his current diagnoses were PTSD, panic disorder with agoraphobia and major depressive disorder. She opined he could not perform his own occupation as an instructor due to symptoms arising from these diagnoses, that included, but were not limited to, the following: (1) an inability to interact with others when he is experiencing a panic attack, is irritable or has severe anxiety; (2) an intolerance for noises and crowds and resulting hypervigilance; (3) an inability to concentrate, organize information, or assess student performance due to overstimulation, triggers and flashbacks; (4) his depressive symptoms that prevented him from analyzing and reviewing data, and making decisions and caused him lack of motivation, feelings of agitation and low energy; and (5) his need for a quiet and safe place when he felt overwhelmed.

50. Dr. Acebo's office visit notes showed Plaintiff went by ambulance to the ER at Christus Spohn Hospital for pain on his left side, chest pressure and numbness in all four

extremities and the ER told him it was caused by anxiety. He also noted Plaintiff's condition was "definitely getting worse" and his anxiety continued to prevent him from working. He also prescribed Celexa, in addition to the Xanax he previously prescribed, to treat his anxiety.

51. Dr. Mauger's office visit notes showed upon physical examination, Plaintiff's range of motion in his cervical spine was limited; he had muscle spasms and tenderness at level 3-4; subluxation at C1-C2 and C5-C7; positive Maximum Foraminal Compression Test, Jackson's Compression Test, and Shoulder Depression Test on both the right and left, as well as positive Spurling's Test and Arm Elevation Test; limited range of motion in both shoulders, but more limited on the left; painfully contracted trigger points in the muscles of the left shoulder; very tender A/C joint and teres and biceps insertions upon palpitation; loss of normal joint play, inflammation with provocation and muscle spasms from the level of T1, T2-T11 and T12; subluxation at T1-T3, T6-T7, and T9-T10; limited range of motion in the lumbar spine; positive Minor's sign test and Valsava test and positive Supine and Seated SLR tests, sustained double leg raise test, Yeoman's test and Kemps oblique test on both the right and left; muscle spasms from L4 to S1; joint inflammation at L1-L5; subluxation at L2-L5; tenderness on palpitation to the hips; and problems with heel and toe walking. In a December 12, 2015 note—5 weeks after Lincoln terminated Plaintiff's benefits—Dr. Mauger opined Plaintiff was permanently disabled from work, he had reached maximum medical improvement, his symptoms had worsened over time, and he displayed symptoms of PTSD.

52. Plaintiff's records from Christus Spohn Hospital showed Plaintiff went to the ER on January 11, 2016 and July 5, 2016 for left-sided numbness and pain, tremors and chest pain. After the ER physician ran several tests, he diagnosed Plaintiff with generalized anxiety. Similarly, on July 5, Plaintiff was taken by ambulance to the ER for shortness of breath,

sweating, a racing heartbeat, and left-sided torso and arm pain. He was given the same diagnosis as on January 11.

53. Despite the new medical evidence and the previous overwhelming medical evidence contained in his claim file supporting his total disability, Lincoln once again upheld its decision to terminate Plaintiff's STD benefits. On December 6, 2016, Lincoln sent Plaintiff a letter denying his appeal for essentially the same reasons it had originally terminated his benefits and denied his first appeal.

54. Plaintiff has exhausted his remedies under the STD Policy. To this day, Plaintiff continues to be impaired both physically and mentally disabled as a result of his diagnoses and symptoms and has been unable to return to work in any capacity.

## IV.
## COUNT ONE
## Breach of the Plan and Policy Provisions Claim

55. Pursuant to 29 U.S.C. § 1132 (a)(1)(B), Plaintiff is entitled to STD benefits as he meets the definition of total disability contained in the STD Policy.

56. Plaintiff has complied with his obligation to make proof of claim in accordance with the STD Policy's requirements and he has exhausted his remedies under the Policy.

57. Plaintiff is entitled to have the Court conduct a trial *de novo* of the issues stated herein because Lincoln operated under a conflict of interest and it failed to conduct a full and fair review of Plaintiff's claim.

58. In the alternative, Lincoln's decision to deny Plaintiff's benefits was arbitrary and capricious.

59. Plaintiff is entitled to STD benefits because Lincoln's evaluation was so flawed and self-interested that its decision to deny him benefits was unreasonable.

60. Lincoln operates with a conflict of interest because it operates in its own interest, and the plan, in turn, relies on Lincoln's evaluation in paying benefits.

61. The Policy provides that in the instance where Plaintiff is disabled—and therefore unable to perform the main duties of his own occupation—then Plaintiff is entitled to benefits under the policy.

62. Lincoln failed to provide for a review that took into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determinations.

63. As a result of Lincoln's conduct, Plaintiff requests that the Court issue him an award of his STD benefits through January 7, 2016 (the date on which 26-weeks of STD benefits were scheduled to expire) and remand his claim to Lincoln for determination of whether he is entitled to LTD benefits.

## V.
## COUNT TWO
### Reasonable and Necessary Attorney's Fees

64. Pursuant to 29 U.S.C. § 1132(g)(1), Plaintiff seeks an award of his reasonable and necessary attorney's fees in connection with the prosecution of this action.

### Prayer

WHEREFORE, Plaintiff requests that the Court order:

1. Lincoln to pay Plaintiff his STD benefits through January 7, 2016;

2. Lincoln consider Plaintiff's eligibility for LTD benefits;

3. Lincoln to pay Plaintiff's reasonable attorney's fees incurred in pursuing recovery of benefits owed to him;

4.      Lincoln to pay Plaintiff pre-judgment and post-judgment interest; and

5.      That Plaintiff recovers the cost of this action and such other and further relief, as the Court may deem proper under the circumstances.

Respectfully Submitted,

**THE LAW OFFICE OF JESSICA TAYLOR**
14100 San Pedro, Suite 602
San Antonio, Texas 78232
(210) 402-4022 (Telephone)
(210) 402-1225 (Fax)


By:     */s/ Jessica Taylor*
         JESSICA TAYLOR
         Texas State Bar No. 24013546
         jessica@jtaylorlaw.com

**ATTORNEY FOR PLAINTIFF**